Filed 10/29/14  P. v. Paigly CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JEREMY PAIGLY, <br><br> Defendant and Appellant. | H035692 <br> (Santa Clara County <br> Super. Ct. No. CC932838) |

Following a jury trial, defendant Jeremy Paigly was found guilty of violating Penal Code section 186.22, subdivision (a) (active participation in a criminal street gang).[1]  At trial, the prosecutor relied on the theory that Paigly conspired with other gang members to establish the third element of the substantive gang offense ("willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang").  (§ 186.22, subd. (a); see § 182, subd. (a)(1).)  The prosecutor contended the target offenses of the conspiracy were assault with a deadly weapon or by force likely to produce great bodily injury (former § 245, subd. (a)(1)) and felony extortion (§§ 518, 520).

On appeal, Paigly contends that the judgment of conviction must be reversed because, apart from expert opinion, there was no evidence of his specific intent to conspire to commit those target offenses.  He maintains that "expert opinion cannot substitute for direct evidence of intent."  He does not dispute the sufficiency of the

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

evidence to establish the other elements of the substantive gang offense or conspiracy. While there was no direct evidence of the specific intent required to prove that Paigly conspired, there is ample circumstantial evidence from which the jury could reasonably infer that Paigly had the intent necessary to prove he committed the crime of conspiracy with other gang members.

Accordingly, the judgment will be affirmed.

I

*Procedural History*

By information filed June 25, 2009, Paigly was charged with violating section 186.22, subdivision (a) (active participation in a criminal street gang). The information alleged four strike convictions (§§ 667, subds. (b)-(i), 1170.12), a prior conviction of a serious felony (§ 667, subd. (a)), and two prior prison terms (§ 667.5, subd. (b)). The four alleged strike convictions included: (1) active participation in a criminal street gang (§ 186.22, subd. (a)), (2) conspiracy to sell methamphetamine with a gang enhancement (§§ 182, 186.22, subd. (b)(1); see Health & Saf. Code, § 11379), (3) possession for sale of methamphetamine with a gang enhancement (Health & Saf. Code, § 11378, subd. (a), § 186.22, subd. (b)(1)), and (4) transportation of methamphetamine with a gang enhancement (Health & Saf. Code, § 11379; § 186.22, subd. (b)(1)). The information alleged that defendant suffered the four strike convictions in "Superior Court, Santa Clara County (#211208)."

Following a jury trial, the jury returned a guilty verdict. Defendant admitted the four strike allegations (§§ 667, subds. (b)-(i), 1170.12), the prior serious felony conviction allegation (§ 667, subd. (a)) and the two prior prison term allegations (§ 667.5, subd. (b)).

By order dated May 6, 2010 and filed May 7, 2010, the court struck one of the prior strike convictions suffered in Santa Clara County Superior Court case No. CC211208 (hereafter "case No. CC211208").

In this case, the court sentenced defendant to a term of 25 years to life consecutive to a determinate seven-year term. The sentence is to be served consecutive to the sentence imposed in case No. CC211208.

II

*Discussion*

A. *Governing Law*

At the time of the offense charged in this case, section 186.22, subdivision (a), stated: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who *willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang*, shall be punished . . . ." (Stats. 2006, ch. 596, § 1, p. 4929, italics added.) The crime of active gang participation has three elements: "(1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523 [67 Cal.Rptr.3d 179, 169 P.3d 102].)" (*People v. Albillar* (2010) 51 Cal.4th 47, 56 (*Albillar*).) As emphasized by defendant, "[m]ere active and knowing participation in a criminal street gang is not a crime." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 (*Rodriguez*).) "Applying the third element of section 186.22[, subdivision] (a), a defendant may be convicted of the crime of gang participation only if he also willfully does an act that 'promotes, furthers, or assists in any felonious criminal conduct by members of that gang.' (§ 186.22[, subd.] (a).)" (*Ibid.*)

3

"As [the Supreme Court] observed in *Albillar*, . . . section 186.22[, subdivision] (a), unlike the gang enhancement in section 186.22[, subdivision] (b)(1), does not require a specific intent to further or promote the gang (only knowledge of the gang's pattern of criminal activity). (*Albillar*, *supra*, 51 Cal.4th at p. 56 . . . .)" (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1134-1135.) "It is established . . . that one need not have the specific intent to promote, further, or benefit the gang to violate section 186.22[, subdivision] (a), nor must one commit a gang-related felony." (*Id*. at p. 1135.)

In *Rodriguez*, *supra*, 55 Cal.4th 1125, the Supreme Court observed: "Nothing in the language of section 186.22[, subdivision] (a) would suggest that one may not promote, further, or assist 'in any felonious criminal conduct by members of that gang' by either aiding and abetting other gang members in committing a felony *or* by directly committing a felony with other gang members." (*Id*. at pp. 1135-1136.) In this case, the prosecutor contended that Paigly directly committed a felony, namely conspiracy, with other gang members.

Under section 182, subdivision (a)(1), " '[a] conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.' (*People v. Morante* (1999) 20 Cal.4th 403, 416 . . . ; see § 184; see also *People v. Homick* (2012) 55 Cal.4th 816, 870 . . . .)" (*People v. Johnson* (2013) 57 Cal.4th 250, 257.) In other words, "a conspiracy requires an intentional agreement to commit the offense, a specific intent that one or more conspirators will commit the elements of that offense, and an overt act in furtherance of the conspiracy. ([*People v.*] *Morante*, *supra*, 20 Cal.4th at p. 416 . . . .)" (*Id*. at p. 266.) Thus, to prove in this case that Paigly committed the crime of conspiracy, the People were required to prove that Paigly had the specific intent to agree to commit an offense,

4

either extortion or assault with a deadly weapon or by force likely to produce great bodily injury, and the specific intent to commit the elements of the offense that was the object of the conspiracy.

" 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 . . . ; see *People v. Homick* (2012) 55 Cal.4th 816, 870 . . . [the element of agreeing to commit a crime 'must often be proved circumstantially'].)" (*People v. Maciel* (2013) 57 Cal.4th 482, 515-516.) The intent elements "may be established through circumstantial evidence. (*People v. Herrera* (2000) 83 Cal.App.4th 46, 64 . . . .)" (*People v. Bogan* (2007) 152 Cal.App.4th 1070, 1074.)

B. *Substantiality of the Evidence*

1. *Insufficiency of the Evidence Claim*

Defendant claims that the evidence was insufficient to establish the intent elements of conspiracy and, consequently, the third element of the substantive gang offense (§ 186.22, subd. (a)). He maintains that the evidence did not show that he "willfully promoted, furthered, or assisted in any felonious criminal conduct by members of the gang." He argues that the evidence was insufficient to establish that he "intended to further a conspiracy to commit removals or extortion." Defendant does not otherwise challenge the sufficiency of the evidence underlying his conviction. Accordingly, while we have reviewed all the evidence, we limit our recitation of it.

2. *Standard of Review*

"The law is clear and well settled. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial

evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 . . . ; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320. . . .) The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932 . . . .) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" (*Id.* at pp. 932-933 . . . .) " 'Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.' " ' (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793 . . . .)" (*People v. Abilez* (2007) 41 Cal.4th 472, 504; see *Coleman v. Johnson* (2012) ___ U.S. ___, ___ [132 S.Ct. 2060, 2064] ["*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.' [Citation.]"].)

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 . . . ; see *Jackson v. Virginia*

6

(1979) 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.)" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

3. *Evidence*

*Expert witnesses*

A number of witnesses testified as experts at trial. Sergeant Dan Livingston, the investigation supervisor in the special enforcement division of the Campbell Police Department, testified as an expert on the organization and structure, operation, activities, rules and procedures, members and associates, and culture of the Nuestra Familia (NF) organization. Officer Dennis Gillotte was working for the Santa Clara County Department of Correction in the intelligence unit of the classification division at the time of trial and he testified as an expert with respect to the activities and organization of the NF organization within the Santa Clara County jail. Criminologist John Bourke, a supervising criminologist with the Santa Clara County Crime Laboratory, was recognized as an expert in handwriting analysis.

Former members of the NF organization, members of either NF or Nuestra Raza (NR), were called as witnesses by the prosecution. Witnesses Chris Klipp and Joseph Abeyta each testified he was a former NR member. Sammy Ramirez testified he was a former NF member, category two and John Mendoza testified he was a former NF member, category three. They were recognized as experts in the organization, structure, and operation of the NF organization.[2]

The evidence reviewed under the proper standard showed the following.

*The NF Organization*

NF developed as a rival Hispanic gang of the Mexican Mafia and primarily operates in Northern California. The NF organization is highly structured, regimental,

---

[2]     Klipp and Abeyta testified under a grant of immunity. Klipp went into protective custody on November 7, 2008. Abeyta went into protective custody in April 2009.

and hierarchical. The NF organization encompasses NF members, NR, a group subordinate to NF, and northerners in street regiments or gangs.

NF members constitute the top tier of NF organization. NR members are the second tier. In more recent times, NF has referred to NR members as "Nortenos," which means northerners in Spanish, or "Hermanos," which means brothers in Spanish.[3] The next tier includes the Northern California street gang members who have not reached the status of NR or NF members. NF refers to them as northerners. The NF organization also has associates who help it, such as by stashing weapons or drugs, laundering money, or facilitating communications.

Three generals, each with different responsibilities, are at the top of the NF organization's command structure. NF's council includes "the generals plus some trusted advisors, high-ranking NF members," who were elected to their positions. The "inner council" advises the NF generals. In 2007, it had five to seven members. The governing constitution, "a very detailed document," specifies the decisions that must go to the council for a vote and the responsibilities of the inner council and the generals.

One NF general is in charge of the streets, a second general is in charge of prisons, and a third general is responsible for conducting internal investigations of particular NF members or a conflict between members. The general in charge of the streets oversees street regiments and communicates with the regimental commanders and makes sure that they follow the directives or policies he sets.

---

[3] For the sake of clarity, we will still refer to NR members. The word "Norteños" is sometimes used to refer to Hispanic gangs generally originating in Northern California whose enemies are Sureños, Hispanic gangs generally located in Southern California. The evidence at trial indicated that the NF now uses the word "northerner" in English to refer to any northern Hispanic street gang member and it has reserved the term "Norteños" for the group previously known as NR and prohibited common street gang members from referring to themselves as Norteños.

At the time of trial, one of the reputed generals operating out of Pelican Bay State Prison was Antonio Guillan, an NF member from San Jose whose moniker was Chuco. Guillan was the general in charge of street operations and regiments. Guillan oversaw San Jose's street regiments and controlled the NF organization in Santa Clara County. The general was "kept apprised" of parolees being released to the streets so he could "assign manpower to certain areas" or send parolees "to function with different street regiments." His authority could not be questioned and his directives had to be followed.

NF's current constitution basically provides that its leadership will be located in Pelican Bay State Prison. Under the constitution, the organization comes before anything else; family is second. Women are regarded "more like property" and they cannot be NF members. There are "14 bonds" that constitute NF's policies; an NF member is required to memorize them and is held accountable for them. One of those bonds mandates "no cowardice [when] dealing with police officers" and no traitors. The inner council and the generals constitute the top leadership of NF and NF controls NR and northerners on the streets.

NF members are ranked by category from one to three, the highest status. Mendoza estimated that, in 2007, there were perhaps 15 to 20 NF members in category three statewide and 100 to 200 NF members in the lower two categories statewide. Sergeant Livingston testified that there are about 20 to 30 category-three NF members at any given time. He estimated there were roughly 200 to 300 NF members.

NF members in all categories are expected to be familiar with NF's constitution, bonds, organization and structure, and activities. To become a member of NF, a person must be sponsored by at least one existing NF member and voted in.

Category one is the entry level for NF membership but even category-one members are "extremely seasoned, experienced gang members." The category-one stage of NF membership is a period of "induction" and "indoctrination." It is a time to study

9

NF's constitution and gain a better understanding of a member's obligations to the organization. A category-two member can educate and train other NF members. A category-three NF member must have been in the NF organization for at least 10 years, be well educated in NF's philosophies and principles, and be completely committed to the organization.

NR is a subsidiary group and is subordinate to NF; NR members number in the thousands. Although NF reasserted itself over NR some time ago and stripped its name, many NR members were still identifying themselves by that name in 2007. To become an NR member, a person must be sponsored by an NF member.

NF and NR members are well-educated about the NF organization's history and its activities and their responsibilities to the organization. A member goes through many months or years of training. The former NF or NR members who testified at trial had gone through an indoctrination process and moved up in the NF organization while in prison.

In prison, NF members are segregated from the general population in higher security housing. NR members in a prison's main line (the general inmate population) are NF's eyes, ears, and arms. NR members try to be placed in the main line of Pelican Bay so that NR can reach a broader prison population and bring more people into the NF organization.

When a person becomes a member of NF or NR, the person understands that he may have to kill for the organization. The NF phrase "blood in," "blood out" means that an NF or NR member must be willing to spill the blood of anyone who is an enemy of the organization and may be required to spill his own blood.

NF's street regiments are supposed to generate money for NF. The NF general in charge of street operations and regiments might assign a parolee being released to a street

10

regiment. When Mendoza was released on parole in 1999, he left with instructions to establish a regiment in Mendocino County, where he was being released.

But not all northerner street gangs, especially first generation gangs, are involved with NF on the streets. Once a northerner gang member is taken into custody, however, he is under NF's umbrella. Someone without any former gang association who goes into custody and chooses to align with the NF organization and act on its behalf will be considered a northerner as well. In a county jail or prison, northerners are educated by members of the NF organization.

NF holds power in jails and prisons. Generally, a northerner in custody must "function with" the NF organization or go into protective custody to avoid "removal," which is a targeted assault.

While in prison and before becoming an NR member, Klipp began assisting the NF organization by doing such things as holding contraband or performing assaults of persons not in good standing. A removal order would reach him through the chain of command, either verbally or in writing. Klipp executed three removal orders. He accomplished two removals with his hands and the third time he cut the victim's face with a razor blade. A gang member who refuses to obey a removal order is removed himself.

While he was an NR member in prison, Abeyta received a removal order to remove or assault his own cellmate. Even though Abeyta liked his cellmate and they were "pretty tight," Abeyta did it because he had to.

Even the testifying defense expert acknowledged the discipline within the NF organization was top-down. In his opinion, a subordinate had no right to decline to perform an instruction given by a superior. He indicated that if a subordinate did not comply with a superior's order, the subordinate risked his life. He stated that discipline in the NF organization was "everything."

11

*Santa Clara County Jail*

The NF organization has a structured chain of command in the Santa Clara County jail (the jail). The NF organization refers to the top NF authority in the jail as the overall authority (OA) or, sometimes, the "regimental commander." The jail's OA sets the policies for the jail. He decides who is in charge of a particular section of the jail and whether there should be a change of command. The jail's OA decides whether a "hit" or "removal" should be done. Lorenzo Guzman, an NF member whose moniker is Lencho, was the jail's OA at the time of trial and he had been the OA since 2007.

Usually, there is a second in command, another NF member or seasoned NR member who handles lesser, day-to-day decisions and serves as a "buffer" to protect the identity of the jail's OA. Underneath the jail's OA in the command structure are the individuals in each section or unit of the jail, variously called the "building channel" or "block channel" (BC) or the "overall authority" of that area. Ordinarily, an NR member in custody in a particular area of the jail will have authority over the northerners housed there. If an NF member is also present in that area, typically the NF member would enjoy greater authority than any NR member.

Each pod within a unit of the jail generally has an inmate serving as "tier security," who handles day-to-day matters and sensitive paperwork, and reports to the BC. A "pod" is a block of cells. The jail's fourth floor has three units, 4A, 4B, and 4C. 4B and 4C are each divided into three pods, each containing 16 cells. 4A of the jail is a less secure area than 4B and 4C, which are maximum security areas. 4A is not divided into pods and contains 48 cells. Inmates in 4B and 4C are allowed out of their cells one at a time for one hour every other day. In contrast, an inmate in 4A is allowed out of his cell at various times each day and may interact with other inmates in an open environment.

The person holding the position of tier security initiates contact with a new inmate entering his area of the jail. Another function of tier security is to inventory weapons, including razor blades, which would be used for removals and assaults. Tier security keeps track of scheduled court dates for inmates in his pod.

While Klipp was the tier security of 4C following his arrest in August 2008, his job included noting suspicious activities, making sure other inmates carried out their responsibilities, and collecting inmates' written reports. For example, Klipp would report any suspicious inmate communications with officers and any information provided by inmates who went out of the pod for any reason and were required to report to him whatever they saw. Klipp made his reports on "kites." A "kite" is a communication written in very tiny letters, "micro writing," on a small piece or strip of paper. Kites were also passed through Klipp and he was responsible for holding them and passing them on, along with his weekly reports, to his BC, who in turn would pass them on to OA Guzman. It was Klipp's responsibility to be familiar with the reports coming from inmates in his pod but it was not his business to look at kites not intended for him.

In general, information of concern to the NF organization is passed up the chain of command to the jail's OA. Directives are sent down the chain.

If there is not a qualified NR member, a northerner may be asked to act as the tier security or a BC.

*Kites*

On a kite, as many as five handwritten lines fit within the space of a single line of lined, yellow paper. A kite is sometimes called a "filter." Messages are sent and conversations are carried on in kites; code words are used.

Kites are generally rolled up and covered in something like plastic wrap so that they can be concealed on a person's body or in clothing. Kites are secreted in a person's mouth, nose, or rectum.

13

Secretive communications are passed on kites up and down the chain of command in the jail hierarchy. Kites are "used heavily" within county jails and prisons and kites are passed between those institutions and out to the NF organization's leadership in the streets. Messages may move indirectly through different jail units until the messages reach their destination in the jail, which may take some time, perhaps days or months.

The person in the position of tier security is responsible for possession of kites. Klipp explained that kites are passed on a "personal basis" to individuals believed to be trustworthy. They are usually passed when someone goes to court but sometimes through jail visits. A kite is transferred in the court's holding tank and the recipient either puts it in his mouth or "keester[s] it," which means putting it in his rectum.

*New Arrivals*

Upon entering custody in a particular area of the jail, a Hispanic new arrival (NA) is required by the NF organization to provide specific information and all his paperwork, including police reports. The pagination of the police report may be checked to make sure the NA is not withholding any pages. The police report discloses the circumstances of arrest and whether the suspect cooperated with law enforcement or made negative or incriminating statements against fellow gang members. The NA is thoroughly questioned and information is also gathered from others to identify the individual and decide whether he should be cleared and allowed to participate in the organization. The NF organization wants to make sure important information is not disclosed to traitors or informants.

An NA is asked for basic information, including, for example, his name, his date of birth, his aka, where he is coming from, his PFN (personal filing number), his booking number (CEN), his neighborhood, and his street gang. Information, good or bad, about the newcomer is gathered by filter from the "manpower," persons in the NF organization. A person acting as tier security may conduct in-depth questioning to find out more information, such as any CDC number, prison history, and status in the NF organization.

14

Officer Gilotte had found kites containing written questions on multiple occasions, either hidden in personal belongings in a jail dorm or on an inmate. The questionnaires asked for general information, including name, PFN, booking number, current charges, prison history, tattoos, gang affiliation and neighborhood. If an NA does not comply with such a questionnaire, the inmate will be viewed as going against gang rules and put himself in danger of being assaulted.

"*On Freeze*"

An NA, regardless of status within the NF organization, is placed "on freeze," which means he is on hold and has no right to intervene in the NF organization's business until he is cleared. Ordinarily, an NA has no access to any NF information, such as who in the organization currently holds authority in the jail or whom is going to be "hit."

A person on freeze ordinarily cannot hold any position of authority within the organization in the jail, such as tier security, BC, or OA. An NF member who is on freeze might nevertheless hold a lot of weight in a section of the jail if he is the most experienced gang member and other northerners might rely on him and he might "step up and do things that he thinks he's supposed to do."

An inmate on freeze may still be asked to assist the NF organization. If an inmate on freeze is assigned to an area out of communication with the jail's OA, he has an obligation to initiate contact with the OA, especially if the person is an NF or NR member. An inmate on freeze in such an area may still take the initiative and try to get his section "in line with the OA."

*Rosters*

Every part of the jail is required to submit weekly rosters and file incident reports with the jail's OA. A basic roster contains personal information regarding the manpower housed in a specific area of the jail. It provides complete identifying information regarding those individuals and permits the NF organization to keep tabs on them.

15

Rosters generally contain inmates' court dates, which are important for passing information from one inmate to another.

Rosters are sent up the chain of command to the jail's OA. Rosters enable secretive communications by the NF organization within the jail, which assist in the commission of felonies within the jail. A roster plays an important role in creating a strong and effective organization in all parts of jail, which in turn makes it easier to do removals and extort money. Sergeant Livingston confirmed that, in general, rosters "facilitate, promote, further, [and] assist" in the NF organization's "felonious criminal conduct."

Individuals listed on a manpower roster may be compared to a "bad news list" (BNL), which is a list of people in bad standing with the NF organization. The jail's OA decides whether action will be taken against anyone listed on a roster.

A roster may be used to select someone for a position of authority in the NF organization within the jail or to make an assignment, including the job of doing a removal. A roster is essential to accomplishing a removal. If the jail's OA determines that an individual must be removed, he knows, based on the roster, where that individual is located and where the removal order should be sent within the jail. Birthdays are included in rosters and the master BNL to make sure the correct person is identified, otherwise someone innocent with the same name might be "hit" by mistake. The roster's personal information allows the OA to correctly identify and target the person in bad standing. Knowledge of inmates' next court dates, which are reported in a manpower roster, facilitate the passing of a removal order.

An "educated person" who participates in the chain of command of the NF organization in the jail understands why rosters are needed.

*Bad News List*

A person may be on a BNL because he is an informant, he owes a fine to NF, or he is otherwise "deemed no good." A person who drops out of the NF organization and cooperates with law enforcement becomes an enemy of the organization. Dropouts may be put on a BNL. If someone goes into protective custody, he is going to be put on a BNL.

The punishment for being on the BNL ranges from physical assault to murder. Dropouts are sometimes attacked and severely injured or killed. In Sergeant Livingston's opinion, there is an ongoing effort to commit crimes against incoming inmates who are in bad standing with the NF organization.

Even if a NA has been cleared within his unit and his name is on a roster, he may still be checked against the names on the OA's BNL. When Mendoza was the jail's OA, it was his responsibility to compare rosters to a master BNL on a weekly basis. A BNL is regularly updated. The BNL available in the NA's section of the jail might be out of date. An updated BNL may leave a state prison with an inmate who secrets it in his rectum and goes to court or is released on parole and then may make its way to a county jail.

*Removals*

A person may be ordered removed because he was on a BNL, he owed money to NF, or he committed some other wrongdoing, such as child molesting. It is part of the responsibility of an OA of a facility, either a jail or a prison, to order removals. The jail's OA does not need to obtain the approval from higher-ups in Pelican Bay before ordering the removal of a person who is not on a BNL. Persons active in, or associates of, the NF organization housed in the unit of a targeted person are selected to carry out a removal directive. A removal order from the jail's OA controls even if the targeted individual was previously cleared.

17

Removals are an ongoing activity required to keep the NF organization's structure strong in the county jail. "[T]aking care of security" in the NF organization is "synonymous with doing removals."

When Mendoza was the jail's OA from about 2004 until late 2005, Mendoza's policy was that removals were done with weapons because that was NF's way to do it.[4] A removal takes a person permanently out of the NF organization and identifies the person as a traitor.

In 2007, Guzman took over as the jail's OA. Guzman's established policy was that removals had to be done with a weapon, ordinarily a razor blade. A removal ordered by the NF organization in the jail is typically orchestrated so that an initial assailant quickly slices the targeted victim's face with a razor blade, cutting him from the corner of the mouth, across the cheek, and up toward the ear. Immediately other attackers assault the victim with hands and feet, which allows the initial assailant time to dispose of his weapon. If an officer notices the altercation, he sees only a fist fight. The resulting scar of such a removal is called a zipper, a smiling face, or a "puto mark," which means the person is marked as a piece of trash.

The parties stipulated that members of the NF organization "authorized and committed an assault using a razor blade against Joel Madrigal in 2007 and Isaac Lastra in 2008." Madrigal's face was sliced in about February 2007. Isaac Lastra's face was sliced in about September 2008; his injury ran from his ear to his mouth. Their injuries were the type typically inflicted by the NF organization on individuals in bad standing.

At the time of trial, Abeyta had been in the jail continuously since 2003. An order from OA Guzman requiring the removal of the Lastra brothers, David and Isaac, was delivered to Abeyta through somebody else in Abeyta's pod. By the time the removal

---

[4]     Under Abeyta, who was very briefly the jail's OA, removals were done with hands.

order was received by Abeyta, David Lastra had already been moved from the pod across from Abeyta to the seventh floor so Abeyta "sent word to the seventh floor," through a filter passed at court, that David Lastra was to be removed. Abeyta also ordered the removal of Isaac Lastra. Abeyta did as he was told because otherwise he would be in trouble himself. At some point later, Abeyta heard that the removals were ordered because David Lastra had "messed with" the underage stepdaughter of an NF member and Isaac Lastra was behind in paying money. When Abeyta was an NR member, he followed orders whether he liked them or not because not following orders had serious consequences.

Even northerners can be asked to do removals. If a person in the NF organization receives an order to remove someone, he has no right to refuse to follow it. A person who fails to comply with a removal order may be stabbed, sliced or stomped.

If an inmate is assaulted in the jail, he will be moved out of his housing unit for his own protection.

*Extortion*

An inmate on a roster might owe a fine, he might have been in trouble and "owe clean-up," or he might owe a debt to NF for drugs, such as methamphetamine, supplied to him. Threats of removal or force may be used to get an inmate to pay money owed to NF.

While the jail's OA, Abeyta had telephone contact with Mendoza, whom Abeyta knew from Pelican Bay. Abeyta asked Mendoza, who was an NF member, for help clearing a northerner in custody from the BNL. The inmate was still trying to function with the NF organization and Abeyta believed the inmate should be removed from the BNL because he had never been to prison and learned the bonds and he had been misled by others into stabbing an NR member. Even as the jail's OA, Abeyta did not have the authority within the NF organization to take someone off the BNL. The NF organization

19

determined that the inmate would be charged $3,000 to be cleared from the BNL.  His choice was to pay or be assaulted.  The inmate paid and he was taken off the BNL.  Abeyta sent out "a filter to all sections" to leave the inmate alone.

Mendoza testified that, when he was the jail's OA, he tried, through a BC or tier security, to get debtors to pay up.  He would require a report explaining why the money had not been paid and try to obtain arrangements for payment.  The debtor would be told that if he did not pay by the deadline, he would be removed and there would be "serious repercussions."

*Kites Written by Paigly*

On November 7, 2008, Klipp was placed into protective custody in the jail.  That day, two bindles of kites wrapped in plastic were retrieved from Klipp, who had been concealing them in his rectum or "keester."  On a subsequent day, Klipp retrieved a third bindle of kites and gave it to an officer.

Klipp, who had been serving as tier security of pod one of section 4C, had been responsible for holding kites and providing a weekly report in a kite to his BC.  Klipp was supposed to have given the kites in his possession to his BC.

Two of the kites recovered from Klipp had been written by Paigly.  One kite was clearly the kind of roster that was expected to be provided to the OA on a weekly basis and identified the manpower.  This kite contained inmates' names and all the vital personal information commonly provided in a roster ("roster kite").

The roster kite listed the "overall manpower" in section 4A of the jail.  It contained 27 inmates' names.  The official housing records of inmates housed in section 4A show that, on November 1, 2008, approximately 57 persons were housed in 4A and all 27 of the names on the roster were inmates housed in section 4A  The balance, approximately 30 inmates, were not affiliated with the NF organization.

20

Each name on the roster was accompanied by identifying information.  The roster specified an inmate's moniker or aka, his gang affiliation, his birth date, any CDC number, his PFN (personal filing number), booking number (CEN), criminal charges, tier name (new moniker), type of housing (such as "GP," which stands for general population), and his next court date (abbreviated to "NCD").  The roster referenced multiple street gangs.

Paigly included himself on the roster, which reported his moniker as "Lil Locs." Paigly has "Lil Locs" tattooed above his right eye and he has a "Locs" tattoo on his right wrist.  The roster also included Felix Medina, whose moniker was reported as "Shorty."

The other kite written by Paigly was a message concerning the running of unit 4A in the jail ("message kite").  It read as follows:

"To:  Capolli . . . .[5]

"Fr.  Coatl . . . .

"Re:  4A. Concern/Breif [*sic*] Report . . .

"DT:  11.1.08 . . . .

"Saludos . . . First and foremost allow us to extend our utmost love and profound respect with a warriors embrace . . . . .

"Sir today I come before you to address the current status of his house hold [*sic*] and its activities here in . . . . . .

"This missive is made in duplicate as to have a better chance in succeeding in touching down for as you stated you have not heard from this unit in 6 months . . .

"I concur with it being unacceptable . . . . . .

"Thus explaining the necessity of this missive . . . .

---

[5]      Dots are in original and do not indicate an omission of words.

"Now sir I 'Jeremy Paigly' 'Lil Locs' D/WSSJ was appointed 'B.C.' by 'Chino' D/VSJ in early Oct. upon Paul Elemen 'Huero' D/EHP departure to the pitts . . .

"And during my tenure this casa has been running smoothly . . . . All H.H.M.s are abiding and honering [*sic*] to all rules/regulations/policies etc. . . .

"With the exception of minor issues that were resolved in the form of D/P/Correction and enlightenment as to be expected . . . . . .

"There was one major issue that delt [*sic*] with 'Chino' relieving ' Mikio' Micheal [*sic*] Washington of the O.A. position for abuse of authority that occurred before 'Chino's' departure to 7.C . . . To which I/Rs have been written in which we still possess and with the failed attempt to get to you we still try along with a bundle that was left by 'Huero' . . . .

"Now Sir . . . Im [*sic*] not here to question you or your decisions . . .  but the appointment of Felix Medina 'Shorty' as the authority here is unbefitting for the following . . . .

"Not only does he lack the education and experience and training . . . his conduct and actions are not that of a[n] authority figure . . . . we ask for the authority to make the appropriate change to someone with more experience . . . in order to better facilitate the functions here in . . . . .

"I write this missive after approval and after Mr. 'Shorty' review . . . . .

"If your decision/wishes remain then we will strive forward as always and I will give my all to aid and assist . . . . . So now on that note allow me to humbly excuse myself with honor, loyalty and carnalismo . . .

"Con mucho respects

"F.N. Also enclosed is a current and updated roster as of 11 1 08

"Forever Forward

"F.N.  Due to present & resent [*sic*] circumstances it is to our understanding . . Callpoli has been relocated . . Please advise as to where to direct our mail . . . Gracias . . ."

The message kite was addressed to "Capolli" and dated November 1, 2008. "Capolli" was a code name that referred to section 4B of the jail.  The code was deduced based partially on the volume of kites going into the area, the fact that Guzman was housed in 4B, and Guzman's status within the NF organization.  In the latter part of 2008, Guzman was the reported OA for the NF organization in the jail and he was housed in 4B.  Guzman was moved out of 4B in early November of 2008.

In Sergeant Livingston's opinion, although the message kite was dated November 1, 2008, the footnote, inquiring where to send mail since "Callpoli" had been relocated, was a postscript added after Guzman was moved and before Klipp possessed it on November 7, 2008.  In the sergeant's opinion, the reference to "Callpoli" was to Guzman.

The message kite was purportedly from "Coatl."  Sergeant Livingston testified that the Aztec language is sometimes used in kites.  Also, code names are used for the sender as well as the recipient of a kite.  In the body of the message, Paigly identified himself as the author by his name and moniker.  It could reasonably be inferred from the evidence, including the content of the message kite and the testimony of the handwriting expert, that Paigly had written both kites.

The message kite's opening salutation and introduction were very common.  "First and foremost" was a phrase that was almost always used.

In the kite, Paigly claimed to have been appointed to the position of "BC," an abbreviation used for building or block channel, after someone's "departure to the pitts." An area of the old jail is called the "snake pits."  The appointing and departing parties

23

were identified by name, moniker, and gang abbreviation. "D/VSJ" means from Varrio San Jose and "D/EHP" means from El Hoya Palmas.

The term "household" or casa, a Spanish word for house, refers to an area of the jail, such as 4A. The term "HHM's" refers to household members. "D/P" means discipline. When a northerner is disciplined for a minor infraction, he may be forced to do a rigorous physical workout, such as burpees, or required to write a 5,000 word essay.

The abbreviation "I/Rs" means incident reports. Every part of the jail is supposed to submit incident reports in addition to weekly rosters. The message kite indicated that Paigly was enclosing "a current and updated roster as of 11 1 08." A "bundle" refers to a bundle of kites.

The jail's OA would expect to occasionally see a report from someone who wants to address the activities occurring in a particular section of the jail. A duplicate kite might be written and sent in different ways if there had been trouble delivering reports.

"Carnal" means brother in Spanish. "C's" or "carnals" refers to NF organization members. The term "carnalismo" is commonly used among NR members and means something like brotherhood. "Forever forward" is a common phrase meaning pushing forward and staying loyal.

In the message kite, Paigly criticized "Shorty" and reported that he had written the kite "after approval and after Mr. 'Shorty' review . . . ." The jail's OA was the only person with the authority to remove someone from his organizational position within the jail.

The kite conveyed that Paigly would abide by the decision of the jail's OA and expressed his continued commitment to the NF organization

*Paigly's Interaction with Ramirez*

After Paigly was moved from 4A to Ramirez's pod in 4C, Ramirez came into contact with Paigly. Although Ramirez was on freeze, Paigly and he had a conversation

24

about the NF organization. It was Ramirez's assessment that Paigly's "heart was in the right place but he still needed a lot of work," "seasoning," and education. Ramirez's opinion was based on experience recruiting NF and NR members "into the struggle" while he was in Pelican Bay.

During a conversation, Paigly admitted to Ramirez that he had passed kites to Klipp. Paigly believed he had been moved from 4A to 4C because he was going to be charged with a gang enhancement related to the kites that had been turned over to authorities by Klipp. It was common knowledge in 4C that Klipp had "locked it up" or was under protective custody. Ramirez received photocopies of the kites during discovery in his own criminal case and he showed them to Paigly.

Paigly explained to Ramirez that he wrote the kites to Guzman because of the chaos in 4A. Paigly indicated that he was trying to get 4A organized and "trying to do his best to hopefully get the manpower on track." Paigly was asking for permission from Guzman to "correct some wrongs" that were occurring in 4A and attempting to become the overall authority for 4A. Paigly indicated that he had thought he could do a better job than the person currently in charge. Paigly indicated that he had been attempting to help the NF organization by sending the kites.

*Paigly's Status and Participation in the NF Organization*

Sergeant Livingston testified that Paigly had been the second in command of the street regiment run by James Cramer, an NF member. The principal activity of the regiment was sales of methamphetamine. By September 2007, a number of that regiment's members had been arrested and the regiment was essentially defunct. In about November 2007, Paigly was taken into custody.

On October 2, 2008, in case No. 211208, Paigly was convicted of a number of crimes, including (1) conspiring to violate Health and Safety Code section 11379 (sale of methamphetamine) on or about and between September 1, 2006 through October 30,

25

2007, (2) active participation in a criminal street gang (§ 186.22, subd. (a)) on or about and between October 1, 2006 and October 30, 2007, (3) violating Health and Safety Code section 11378 (possession for sale of methamphetamine) on or about January 26, 2007, and (4) violating Health and Safety Code section 11379 (transportation of methamphetamine) on or about January 26, 2007.[6] Gang enhancement allegations attached to the conspiracy conviction and the Health and Safety Code violations were found true (see § 186.22, subd. (b)(1)(A)).

Sergeant Livingston testified that, in case No. 211208, he had testified as an expert and described in great detail the criminal activities of the NF organization in state prison and the jail. He testified that his prior testimony covered removals done by the NF organization and the means and methods of such removals, the use of kites, and rosters. Livingston testified that Mendoza had previously testified in case No. 211208 regarding NF's extortion of inmates and NF's use of weapons in removals. According to Livingston, Mendoza testified regarding NF's methods of communication, including kites, and he testified in detail how kites facilitate the criminal conduct of the NF organization. Paigly was present for all that testimony.

Sergeant Livingston had testified in that prior case that Paigly was a member of NR. It was still Sergeant Livingston's opinion that Pagily was an NR member during the period of September 2006 through October 30, 2007.

In the present case, Sergeant Livingston testified to his opinion that Paigly was still an NR member. Livingston based his belief partly on the investigations in both the present and prior cases and on Paigly's tattoos. Sergeant Livingston had no information that defendant Paigly dropped out of NR during the prior prosecution or after return of the verdict in that case.

---

[6]     The indictment in that case named many defendants, including Cramer and Paigly.

Sergeant Livingston had heard that NF had put Paigly on freeze and stripped his status. If section 4A were out of communication with the jail's OA, even an NR or NF member "on freeze" in 4A would remain obligated to communicate with the OA.

When an NF member is "stripped of status," it means the person has gotten into "some type of trouble" and he cannot function as a full member or hold a position of authority while the matter is investigated and until he is cleared. In the sergeant's opinion, Paigly did not accept any such decision to strip him of status and Paigly "tried to step up" because he is very motivated and "always tries to get actively involved . . . ."

It was Livingston's opinion that Paigly was actively involved in the NF organization in November 2008. In Livingston's opinion, Paigly chose to actively participate in the NF organization in jail by compiling a roster of 27 names and sending two kites to the jail's OA. Livingston found it significant that, in the message kite, Paigly identified himself as the BC and expressed his allegiance to the organization.

In Ramirez's opinion, sending a kite, holding a position of authority like BC, and sending requests up the chain of command concerning the performance of others in the structure were consistent with a person actively involved in the NF organization. As far as Ramirez knew, Paigly had never sought protective custody while in the jail.

4. *Analysis*

a. *Expert Opinion*

Citing *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), disapproved in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, footnote 3, and *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*), Paigly argues that the prosecution could not rely solely on expert testimony to prove a gang member's intent. He asserts that "[t]he only 'evidence' of [his] specific intent was contained in Sergeant Livingston's opinion that roster[s] furthered the felonious conduct of NF."

27

In *Killebrew*, *supra*, 103 Cal.App.4th 644, the East Side Crip gang claimed responsibility for a fatal drive-by shooting against a rival gang. (*Id*. at p. 647.) Officers subsequently observed three cars traveling together and carrying young Black males in East Side Crip territory shortly after midnight. (*Id*. at p. 648.) "[T]he officers reasoned that because the East Side Crips would be expecting retaliation for the . . . shooting, they would travel only in large groups that night and would carry weapons for protection." (*Ibid*.) The occupants of the vehicles were arrested and handguns were recovered. (*Ibid*.) Killebrew, who had observed the stop of one of the vehicles from a street corner, was also arrested. (*Id*. at pp. 648-649.)

Killebrew was convicted of conspiring to possess a handgun. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 647.) "The prospect of retaliation was the basis for the actions taken by the officers that night as well as the foundation of the prosecution's conspiracy theory." (*Id*. at p. 650.) "Killebrew did not have a handgun in his possession, but it was alleged that he was part of a conspiracy to possess the handgun. At trial, a police officer testified as an expert on gangs to establish not only Killebrew's membership in a criminal street gang, but his subjective knowledge and intent to possess the handgun." (*Id*. at p. 647.) "Through the use of hypothetical questions, [the prosecution's expert] testified that each of the individuals in the three cars (1) knew there was a gun in the Chevrolet and a gun in the Mazda, and (2) jointly possessed the gun with every other person in all three cars for their mutual protection." (*Id*. at p. 658.)

The Fifth District Court of Appeal found that the expert's testimony was the only evidence offered to establish conspiracy. (*Killebrew*, *supra*, 103 Cal.App.4th at p. 658.) It concluded that the testimony constituted "an improper opinion on the ultimate issue and should have been excluded. [Citation.]" (*Ibid*.) The court found there was insufficient evidence that the defendant was an occupant in one of the vehicles carrying armed gang members. (*Id*. at pp. 660-661.)

28

In *Frank S.*, after a police officer stopped a minor for riding a bicycle through a red light, the officer discovered a concealed, fixed-blade knife. (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1195.) Minor said "he had been attacked two days prior and needed the knife for protection against 'the Southerners' because they feel he supports northern street gangs." (*Ibid.*) At trial, when the prosecutor asked the gang expert for "her opinion of the minor's purpose for the knife, the expert stated the minor possessed the knife to protect himself." (*Ibid.*) The expert also indicated that "a gang member would use the knife for protection from rival gang members and to assault rival gangs" and "the minor's possession of the knife benefited the Nortenos" because "it helps provide them protection should they be assaulted." (*Id.* at pp. 1195-1196.)

On appeal, Frank S. claimed the evidence was insufficient to support the gang enhancement allegation (§ 186.22, subd. (b)(1)) attached to his crime of possession of a dirk or dagger. (*Frank S.*, *supra*, 141 Cal.App.4th at pp. 1194-1195.) The Fifth District Court of Appeal, relying upon its earlier *Killebrew* decision, agreed that there was not substantial evidence showing that minor "had a specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.* at pp. 1196-1198.)

Killebrew is distinguishable from this case because the object of the conspiracy was unlawful gun possession and the evidence showed that the defendant was a mere bystander and there was no circumstantial evidence that he and another person had the specific intent to agree to commit that target offense and the specific intent to commit the elements of that offense. (See *People v. Johnson*, *supra*, 57 Cal.4th at p. 257.) *Frank S.* is also distinguishable because it concerns a gang enhancement under section 186.22, subdivision (b)(1), which requires a different specific intent than the subdivision at issue here.

Moreover, in *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*), the California Supreme Court disapproved of *Killebrew*: "We disapprove of any interpretation of

29

*Killebrew* . . . as barring, or even limiting, the use of hypothetical questions. Even if expert testimony regarding the defendants themselves is improper, the use of hypothetical questions is proper." (*Id*. at p. 1047, fn. 3.) The Supreme Court assumed that "for present purposes the expert could not properly have testified about defendants themselves." (*Id*. at p. 1048, fn. 4.) It noted, however, that in "some circumstances, expert testimony regarding the specific defendants might be proper. [Citations.]" (*Ibid*.)

In *Vang*, the Supreme Court further explained: "To the extent that *Killebrew* . . . was correct in prohibiting expert testimony regarding whether the *specific* defendants acted for a gang reason, the reason for this rule is *not* that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' (Evid. Code, § 805; see *People v. Prince*, *supra*, 40 Cal.4th at p. 1227 . . .; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1370-1371 . . . .) Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77 . . . ; see also *People v. Prince*, *supra*, at p. 1227 . . . .)" (*Vang*, *supra*, 52 Cal.4th at p. 1048.)

In any event, both *Killebrew*, *supra*, 103 Cal.App.4th 644 and *Frank S.*, *supra*, 141 Cal.App.4th 1192 are inapposite to this case. Sergeant Livingston was not asked, and he did not testify, about defendant's specific intent. In fact, the prosecutor

30

specifically told Sergeant Livingston that he was *not* asking "what Jeremy Paigly had in mind in regard to this specific case."

Further, neither *Killebrew* or *Frank S.* addressed the rule that inadmissible evidence admitted without objection may be considered in determining the sufficiency of evidence to support a conviction.  In *People v. Panah* (2005) 35 Cal.4th 395, 476, the California Supreme Court stated that " ' "[i]t is settled law that incompetent testimony, such as hearsay or conclusion, if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding." ' [Citation.]"  In *McDaniel v. Brown* (2010) 558 U.S. 120, 131 [130 S.Ct. 665] (*per curiam*), the United States Supreme Court made clear that "a reviewing court must consider all of the evidence admitted at trial when considering a *Jackson* [insufficiency of the evidence] claim."

As we will explain, we find the evidence sufficient and reject defendant's substantiality of the evidence claim.

b. *Sufficient Evidence of Specific Intent*

"A conspiracy can generally be established only by circumstantial evidence." (*People v. Robinson* (1954) 43 Cal.2d 132, 136.)  "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.]  The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.  [Citations.]' (*People v. Cooks*, *supra*, 141 Cal.App.3d at p. 311 . . . .)" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.)  "[T]he existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement [to commit a crime] was formed, particularly since such agreement must often be proved circumstantially." (*People v. Homick* (2012) 55 Cal.4th 816, 870.)

31

"Regarding a specific intent element of a crime, [the Supreme Court has] explained that '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208 . . . .)" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) "The jury may infer a defendant's specific intent to commit a crime from all of the facts and circumstances shown by the evidence. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

In this case, the evidence was sufficient to show that Paigly authored and hand-wrote the message kite and the roster kite. The inference that Paigly was an experienced gang member could be drawn from the evidence that he held the number two position in Cramer's street regiment and he had reached the level of an NR member within the NF organization. A trier of fact could reasonably infer from Paigly's writing and sending of those kites and their contents, considered in the light of the other evidence regarding his status in the NF organization, that Paigly was intimately familiar with the structure, organization, operation, procedures and protocols of the NF organization in the jail and Paigly chose to be an active participant in the organization.

It may be inferred from the language of the message kite and the sending of the roster of northerners in 4A that Paigly was fully aware of the structure and operation of the NF organization in the jail and he was willing to obey the directives and orders handed down by the higher authority of the NF organization within the jail. Once he was moved to a pod in 4C after the authorities had obtained the kites, Paigly sought the advice of Ramirez, who had advanced to a category-two NF member and also had been an NR member. This evidence buttresses the inference that Paigly was actively seeking to be an active participant in the NF organization.

A trier of fact could reasonably infer that, when Paigly authored the kites and when he passed them on, Paigly had a special interest in protecting the jail's NF

32

organization of which he was a part. The evidence supported the inferences that removal was a standard practice of the NF organization, the NF organization maintained its hegemony by removing persons in bad standing within the organization, and, under OA Guzman, removals were performed by slicing the victim's face with a razor and then assaulting the victim with hands and feet.

The evidence was sufficient to show that an ongoing purpose of rosters was to facilitate removals by the NF organization. The personal information contained in a manpower roster enables the jail's OA to confirm the identities of listed persons who are determined to be in bad standing or who are found to be on a BNL and to locate them within the jail. If the OA decides a removal order is necessary, he can use a manpower roster to determine where and to whom to send the order within the jail and when the order can be passed at court.

Further, the evidence as a whole supported an inference that Paigly was a sufficiently knowledgeable and committed member of the NF organization to be fully aware that rosters were used to facilitate removals, a removal was an assault with a razor blade, a removal was a standard consequence imposed on members in bad standing with the organization, and any member of the NF organization in the jail, including himself, could be ordered to execute a removal. Based on circumstantial evidence and the reasonable inferences drawn from that evidence, a trier of fact could reasonably infer from the kites and other evidence that Paigly tacitly agreed with other members of the NF organization to commit "removals" of persons in bad standing with the organization. Further, a trier of fact could reasonably find that Paigly and one or more of the members of the NF organization had the specific intent to agree to commit assault with a deadly weapon or by force likely to produce great bodily injury and, at the time of the agreement, specifically intended to commit the elements of that offense. In light of our

33

conclusion, we need not decide whether the evidence was also sufficient to prove the intent elements of a conspiracy to commit extortion.

Paigly argues that the prosecutor's theory at trial was flawed because "there were many reasons for creating a roster beside conducting removals or committing extortion" but the prosecutor's position was that rosters are prepared for only the purpose of conducting removals or committing extortion. The prosecutor did not argue that the exclusive purpose of a roster was to facilitate the commission of removals and extortions. Regardless, a trier of fact could reasonably infer that Paigly intended the roster to be used for all the usual purposes, including removals.

Paigly points out that "there was no evidence that any of the people on the list committed a removal or an extortion." Such proof is not required. "Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the object of the conspiracy. [Citation.]" (*People v. Swain* (1996) 12 Cal.4th 593, 599.) "Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy. [Citations.]" (*People v. Morante*, *supra*, 20 Cal.4th at p. 416, fn. omitted.)

Paigly suggests that his purpose in writing the roster "could have been simply to inform the OA of the identity of the 'manpower' on 4-A without having any idea what eventual use would be made of the list." Paigly asserts that it was "pure speculation to know what [he] intended when he prepared the roster." While we acknowledge there was no direct evidence of Paigly's intent, that is not unusual.

" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.) In assessing the sufficiency of the evidence, "[a]n appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

34

In this case, circumstantial evidence and the reasonable inferences drawn from that evidence were sufficient to prove the specific intent elements of a conspiracy to commit a violation of former section 245, subdivision (a)(1), and support the jury's finding that Paigly violated section 186.22, subdivision (a). "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

DISPOSITION

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.



_____

MIHARA, J.